# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| VICKI REVENNAUGH, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | Case No. 2:16-cv-783 |
| | : | |
| v. | : | JUDGE ALGENON L. MARBLEY |
| | : | |
| UNITED STATES POSTAL | : | Magistrate Judge Vascura |
| SERVICE, *et al.*, | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| STEPHANIE BARNHOUSE, | : | |
| | : | |
| Plaintiff, | : | Case No. 2:17-cv-879 |
| | : | |
| v. | : | JUDGE ALGENON L. MARBLEY |
| | : | |
| UNITED STATES POSTAL | : | Magistrate Judge Vascura |
| SERVICE, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## OPINION & ORDER

This matter is before the Court on Defendants' Motions for Summary Judgment in two lawsuits: *Revennaugh, et al. v. United States Postal Service, et al.*, 2:16-cv-783; and *Barnhouse v. United States Postal Service, et al.*, 2:17-cv-879. (2:16-cv-783, ECF Nos. 30, 31; 2:17-cv-879, ECF No. 26). Plaintiffs Stephanie Barnhouse and Vicki Revennaugh have alleged violations of the Family Medical Leave Act ("FMLA"). Plaintiff Barnhouse has also brought a separate suit, 2:17-cv-879, for sex discrimination under Title VII. These motions are fully briefed and ripe for review. For the following reasons, this Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motions.

# I.  FACTUAL AND PROCEDURAL BACKGROUND

## A.  USPS FMLA Policies

This suit involves alleged violations of the FMLA at the New Concord Post Office under Postmaster Janis Spillman.  USPS leave policies are set out in the Employee and Labor Relations Manual ("ELM").  USPS employees accrue paid sick leave that they may take by completing PS Form 3971.  (ECF No. 31 at 4).  This sick leave must be "approved in advance by the appropriate supervisor" unless the request is for "unexpected illness or injury."  (*Id.*; ELM 513.331).  If sick leave is unplanned, the employee must notify their employer of the illness or injury and how long they expect to be off work "as soon as possible."  (ECF No. 31 at 5; ELM 513.332).  Afterwards, "the employee must submit a PS Form 3971 and applicable medical and other certification upon retuning to duty and explain the reason for the absence."  *Id.*  The ELM also specifies what type of medical documentation is required based on how long the leave was.

If the employee is able to provide advance notice and there is enough information to suggest that the leave might be subject to the FMLA, then USPS will send several forms to the employee, including "FMLA Notice of Eligibility and Rights and Responsibilities, and the appropriate certification form for the employee's health care provider to complete and return." (ECF No. 31 at 5–6; ELM 513.332).

Despite these formal processes for requesting leave, Spillman often accepted less formal means of notifying her of absences, such as leaving her a note so she had the information for scheduling purposes.  (ECF No. 33 at 4) (citing Spillman Dep. 15:11-16:12; 49:13-18).

When an employee's FMLA leave is over, they are generally "entitled to return to the positions they held when the absence began, or to equivalent positions . . . if they are able to perform the essential functions of the positions."  ELM 515.7.  But an employee "must provide

2

certification from his or her health care provider that the employee is able to perform the essential functions of his or her positions with or without limitations." ELM 515.534. But employees returning from leave are only entitled to what they would have had without the absence. They are not entitled "to intangible, unmeasurable aspects of the job such as the perceived loss of potential for future promotional opportunities." ELM 515.7.

### B. Vicki Revennaugh

Vicki Revennaugh began her service with the United States Postal Service in 1990 as a Rural Carrier Associate. (ECF No. 31 at 1). Rural Carrier Associates "would work and fill in when the carrier was off." (ECF No. 31, Ex. A, Revennaugh Dep. at 12:20–23). Revennaugh was hired as the RCA for the post office in Philco, Ohio but in 1991 or 1992, she started to fill in for other post offices including routes in Norwood, Chandlresville, Adamsville, and New Concord. (*Id.* at 16: 1–11). In 1993, Revennaugh moved to the Norwich Post Office as an RCA, and in 2012, she became a Rural Carrier with Norwich. (ECF No. 31 at 2). Revennaugh's "designated day off" was Saturday. *Id.* Stephanie Barnhouse, also a plaintiff in this lawsuit, was the backup carrier for Revennaugh at Norwich.

In 2013, USPS was downsized (delivery unit optimization or "duoed"), and Revennaugh and Barnhouse were transferred to New Concord. (ECF No. 31 at 2–3). The Postmaster at New Concord is Janis Spillman.

Ms. Revennaugh began caring for her parents in 2012 and 2013. In 2012, Ms. Revennaugh used her paid leave to care for them. (ECF No. 31 at 8). But in March 2013, Revennaugh requested FMLA leave. Her requests were approved, and she was authorized to take intermittent leave to care for her mother and father. She was authorized to take leave one to

two times a week to care for her mother, or 2–3 days per month.  (ECF No. 33 Ex. 3).

Approximately the same was approved for her to care for her father.  (ECF No. 31 at 8).

Ms. Revennaugh had no issues with her FMLA leave until August 2014.  USPS was particularly short-staffed the week of August 11, 2014, because the county fair was around that time, and "everybody want[ed] off for the fair."  (ECF No. 31 at 9).  Additionally, Ms. Revennaugh "unexpectedly requested FMLA leave of her own for August 14–September 2, 2014, . . . and did not report to work on August 15."  (ECF No. 31 at 10).

At the time, Ms. Revennaugh was on the "Relief Day Work List," a list of employees who were "willing to work on their day off, if needed."  (ECF No. 33 at 4).  In late July 2014, Ms. Spillman notified Ms. Revennaugh that she needed Ms. Revennaugh to work on Saturday, August 16, 2014—a day she would normally have off.  (ECF No 33 at 4–5; ECF No. 31 at 9–10).  Ms. Revennaugh said she could not work on August 16.

On August 11, 2014, she submitted an FMLA request through PS Form 3971 for August 16th.  (ECF No. 31 at 10; ECF No. 33 at 5).  On August 12, she turned in a doctor's note regarding her FMLA leave for her parents "that restricted her from working Saturdays."  (ECF No. 33 at 5).  The doctor's note states, in its entirety: "FMLA. Patient cannot work Saturday shifts due to ongoing care [illegible] parents," and included the FMLA case numbers for her parents.  (ECF No. 33 Ex. 6).  On August 13, Ms. Revennaugh took herself off the Relief Day Work List.  Ms. Spillman was on vacation that week, and Cheryl Hines was filling in.  (ECF No. 31 at 10 n.3).  Hines denied Ms. Revennaugh's leave request because the request was made after she had been asked to work.  (ECF No. 31 at 10).

Despite Ms. Revennaugh's request, on August 15, Ms. Spillman called Ms. Revennaugh and again told Ms. Revennaugh that she was scheduled to work on August 16 and would also be

scheduled to work "every Saturday after that until a substitute was available." (ECF No. 33 at

5). Ms. Spillman also told "Ms. Revennaugh that she would . . . be required to work on the

following Monday and Tuesday, August 18, 2014 and August 19, 2014"—both days that

Revennaugh had been approved to be off to take care of her parents. (ECF No. 33 at 6). Ms.

Revennaugh also alleges that, when a Rural Carrier is scheduled to work on their day off, they

are permitted to choose another day off the following week, but she was not given the chance to

do so. (ECF No. 33 at 6).

Ms. Revennaugh alleges that during this call, Spillman "yelled at and belittled Ms.

Revennaugh, causing her to suffer an anxiety attack." (ECF No. 33 at 6). Ms. Revennaugh was

apparently so upset that she walked out and returned with a doctor's note saying that Ms.

Revennaugh would need to be off work from August 12 through August 31 because of "a history

of illness exacerbated by situational stress." (ECF No. 33 Ex. 8). She then applied for FMLA

leave for this absence. That leave was approved on August 29, 2014 and was later extended until

September 12, 2014. (ECF No. 33 Ex. 9). Thus, Ms. Revennaugh did not work on August 16,

2014.

On August 21, 2014, Ms. Spillman sent Ms. Revennaugh an "Extended Absence" letter,

notifying her that she had not provided acceptable documentation for her leave and that failure to

correct the insufficient documentation would place her in Absent Without Official Leave

("AWOL") status. The letter also informed her that being AWOL "could result in disciplinary

action, up to and including removal from the Postal Service." (ECF No. 33 Ex. 10). Ms.

Revennaugh was also required to attend a Pre-Disciplinary Hearing ("PDI") on September 10,

2014, during her FMLA leave, to discuss her absences. (ECF No. 33 at 7).

Ms. Revennaugh returned to work on September 13, 2014.  She maintained her need to be off on Saturdays so she could care for her parents.  She believed she did not need to submit a formal PS Form 3971 because USPS already had the doctor's note, and Saturdays were supposed to be her day off.  (ECF No. 33 at 8).  Ms. Revennaugh was scheduled to work several Saturdays in October and November, despite Ms. Barnhouse allegedly being available to sub for her.  (ECF No. 33 at 8–9).

Ms. Revennaugh ultimately filed grievances with her union.  She alleges that she "lost wages and incurred medical and other expenses as a result of Defendant's conduct."  (ECF No. 33 at 9).  Ms. Revennaugh still works at USPS.

### C.  Stephanie Barnhouse

In May 2012, Stephanie Barnhouse began working as a Temporary Rural Relief Carrier ("TRC") for USPS.  TRCs are part-time carriers "who fill[] in when the primary carrier is off work."  (ECF No. 30 at 2).  Barnhouse worked out of the Norwich Post Office and "was guaranteed to work one day a week—generally Saturdays—as the backup carrier for Plaintiff Vicki Revennaugh."  (ECF No. 30 at 2).  Like Revennaugh, Barnhouse was also affected by the USPS downsizing.  Barnhouse stayed a TRC and was the designated substitute for Revennaugh, now out of New Concord, under Janis Spillman.  Barnhouse began picking up more work in 2013, going from working about one day a week to working three or four days.  (ECF No. 30 at 3).

TRC positions are limited to one year, and TRCs are required to take a break in service before working for USPS in another role.  Before the USPS downsizing in 2013, "USPS eliminated all TRC positions."  (ECF No. 34 at 3).  The parties dispute how long Ms. Barnhouse remained a TRC.  According to Ms. Barnhouse, "USPS led her to believe that [she] should have

become an RCA as soon as the TRC position was eliminated, prior to 2013."  (ECF No. 34 at 3).

Ms. Barnhouse makes this assertion based on her deposition testimony that she does not believe

that her RCA appointment form is correct when it lists May 4, 2013, as her appointment date

because she believes that "[w]hen [she] was at the Norwich Post Office they got rid of the TRCs

and made them RCAs.  So . . . [she] should have been changed before we were duoed into New

Concord."  (ECF No. 34 Ex. 1, Barnhouse Dep. 39:19–40:7).  Ms. Barnhouse further testified

that she understood "getting rid of" the TRCs to mean "[e]ither I would have been fired or I

would have been made into an RCA, and I was not fired."  (ECF No. 34 Ex. 1, Barnhouse Dep.

40:16–25).  Ms. Barnhouse took and passed an RCA test, though documentary evidence appears

to have been inadvertently omitted showing the date of her test.

USPS asserts that "Ms. Barnhouse was still a TRC until her term ended in April 2013."

*Id.*  In April 2013, Barnhouse's TRC appointment expired and, after a short break, she was hired

as a Rural Carrier Associate ("RCA"), still as the back-up for Revennaugh.  (ECF No. 30 at 4).

Because Barnhouse did not hold a full-time position, she did not accrue sick leave until she

"filled in long-term for Revennaugh" (after the events at issue here).  (ECF No. 30 at 8).

Barnhouse, however, could take leave without pay.  *Id.* at 9.

In July 2014, a Rural Carrier position in New Concord came open.  The Rural Carrier

position was for a route other than the route that Barnhouse was a substitute for.  These positions

are filled according to the process specified in Article 12 of the National Agreement between

USPS and the National Rural Letter Carriers' Association (the Union).  Under the Agreement,

vacancies are filled by "the RCA applicant having one (1) year of continuous service as an RCA

and having accrued the longest period of continuous service as an RCA in that office, unless

another RCA is deemed to be substantially better qualified."  (ECF No. 30 Ex. H at 61–65).  If

two RCAs with the same amount of seniority apply for a Rural Carrier position, the position will go to the RCA who has served the longest period of time as an RCA, regardless of office location. (ECF No. 30 at 7).

Barnhouse attempted to apply for the Rural Carrier position online but encountered difficulties because the online system evidently did not have a seniority date listed for Ms. Barnhouse. (ECF No. 34 at 4). Ms. Barnhouse testified that she called the service number listed for technical difficulties with the online form and was told that she "had no seniority date." (ECF No. 34 Ex. 1, Barnhouse Dep. 154: 1–7). She told Spillman, and Spillman obtained paper forms for her to apply, and Barnhouse submitted an application. RCAs are only eligible for Rural Carrier positions if they have one year of service. Barnhouse listed her seniority date on the form as January 2013, and Janis Spillman signed off on the form. (ECF No. 30 at 13; ECF No. 34 at 4).

Barnhouse was not hired for the Rural Carrier position. Instead, USPS hired Kevin Gregg, who had been serving as the RCA for the Rural Carrier on that route. (ECF No. 30 at 13). Gregg had been an RCA since October 6, 2012. *Id.* He started his RCA service in West Lafayette but was transferred to New Concord on May 4, 2013. USPS asserts that Barnhouse also started in New Concord on May 4, 2013, but because they had the same time of service at New Concord, the position went to Gregg as the RCA with longer service in any location. (ECF No. 30 at 14). Ms. Barnhouse argues that Gregg did not serve as an RCA longer than she did because she "had passed the RCA test even before Mr. Gregg became an RCA in October of 2012." (ECF No. 34 at 5).

Because she was not chosen to fill the Rural Carrier position, Ms. Barnhouse contacted the Equal Employment Opportunity Commission ("EEOC") in July 2014 to make an allegation

of sex discrimination and retaliation. (Barnhouse Dep. 148). By July 29, 2014, Ms. Barnhouse had completed EEOC paperwork and had asked to see a Dispute Resolution Specialist. (Barnhouse Dep. 144: 21–24).

On August 8, 2014, Ms. Barnhouse went to talk to Ms. Spillman after hours. Ms. Barnhouse and Ms. Spillman have vastly different accounts of the events that evening. Ms. Barnhouse says that Ms. Spillman "invited me in her office." (Barnhouse Dep. 129:13–17). She believes that Postmaster Hines was also there. Ms. Barnhouse wanted to discuss the Rural Carrier position she had applied for and why she was not hired for the position. She asked why she did not "have a seniority date in the computer." *Id.* at 130:1–14. She does not remember discussing anything else and does not recall being "loud, angry or aggressive" towards Ms. Spillman. *Id.* at 130: 22–23. Ms. Barnhouse says that when she left Ms. Spillman's office, Spillman hugged her "and said she liked [her] hair." *Id.* at 130:23–25.

Ms. Spillman alleges that on August 8, she and Ms. Hines, the postmaster who would be covering for Ms. Spillman while she was on vacation, were in Ms. Spillman's office talking about what Ms. Hines would need to do while she was out. Spillman says that Barnhouse "beat on the door, and she was screaming and yelling." (ECF No 34 Ex. 2, Spillman Dep. 108:18–19). Hines opened the door, and Barnhouse "came rushing in and would have hit me" and that Hines had to step in front of Barnhouse to keep Spillman from being hit. *Id.* at 108:23–109:6. Spillman said she felt threatened. *Id.* at 109:7– 9.

Barnhouse had also requested leave from August 13, 2014 to August 15, 2014. (ECF No. 30 at 15). She requested this leave at the end of July 2014. Because she did not have annual or sick leave, this leave would have been "leave without pay." (Barnhouse Dep. 78:5 – 15). This does not appear to have been FMLA leave because the first time Ms. Barnhouse can recall

submitting FMLA leave was for herself because of harassment at work. (Barnhouse Dep. 75:6–14). Her daughter was participating in the County Fair that week, so the leave may have been related to her daughter's Fair participation, but the record is unclear. Barnhouse thought she had been approved for leave, though her leave request slip notes that her leave was disapproved. (ECF No. 30 Ex. 14).

USPS argues that Spillman tried to accommodate Ms. Barnhouse's leave request, even though USPS was particularly short-staffed that week because of the County Fair. She initially was able to find another carrier, Aaron Shad, to work Barnhouse's route, and told Barnhouse that she would just come in for half-a-day and "case" the route; that is, "placing the mail in delivery sequence," which "generally takes 'an hour, hour and a half' to complete depending on the mail volume that day." (ECF No. 30 at 15 n.7) (quoting Spillman Dep. 27:6 – 28:5).

Aaron Shad, however, "was called back to his primary route assignment because the primary carrier there experienced a family emergency." (ECF No. 30 at 16). No one else was available to cover Barnhouse's route. Spillman does not recall when Barnhouse would have found out that Shad could no longer cover her route. (Spillman Dep. 32: 9–12). Spillman says Barnhouse called her on August 12. (*Id.* at 32: 18–24). Whether Spillman communicated to Barnhouse on the 12th that Shad was unavailable or spoke to her about it some other day, Spillman recalls that Barnhouse told her she thought she could just case the mail that day. Spillman told Barnhouse that Shad was not available and she would have to work the rest of the week, including August 13–15. (*Id.* at 38: 9–19). Spillman alleges that people across the room from her could hear Barnhouse yelling at her on the phone. (*Id.* at 40: 2–4). Barnhouse, however, asserts that she "was a little loud on that day, because I was on the phone with my union rep." (Barnhouse Dep. 131: 17–18).

When Ms. Barnhouse called her union rep, they told her she would have to work August 13–15 even though she had already asked for those days off.  (ECF No. 30 at 17).  On August 13, Barnhouse left for a period of time and then came back to work.  Barnhouse "also cased and delivered the mail on August 14."  (ECF No. 30 at 17).

On August 14, Barnhouse went to her doctor because of stress and anxiety related to work.  He suggested sometime around that time frame, but maybe not at the appointment on August 14, that she take anxiety medication.  (Barnhouse Dep. 92: 9–14).  Barnhouse's doctor gave her a note stating, "[i]t is my medical opinion that Stephanie Barnhouse should remain out of work from 8/14/14 until 9/2/14."  (ECF No. 30 Ex. O at 7).  Her husband dropped this letter off at USPS New Concord on August 15.  She later submitted a doctor's note from August 27 that stated "Pt off work from 8-14-14 thru 9-2-14 D/T anxiety stress working conditions."  (ECF No. 30 Ex. R at 3).  Barnhouse did not show up for work on August 15.

Spillman alleges that she consulted with others at USPS to determine what to do because Barnhouse had left without any scheduled leave.  USPS "Labor Relations ultimately determined that Barnhouse had submitted 'unacceptable documentation' and prepared a letter for Spillman to send to Barnhouse."  (ECF No. 30 at 19) (quoting Spillman Dep. 65:1 – 66:17).  Spillman sent Barnhouse the same kind of letter she sent Revennaugh—"Extended Absence/Acceptable Documentation of Absence from Duty."  *Id.*  Ms. Barnhouse received the letter on August 21, 2014.  That letter explained that she needed to submit additional documentation and that, if she did not, she could be disciplined and possibly fired from USPS.  *Id.* at 19–20.  Barnhouse's leave was approved as FMLA leave on September 2, 2014.

On August 29, 2014, Ms. Barnhouse returned to her doctor and obtained a note stating that she could "return to work on 9/2/2014 without restriction."  (ECF No. 30 Ex. R at 4).  But

USPS alleges that Barnhouse was not scheduled to work on September 2 because Spillman did not know Barnhouse planned to return that day. (ECF No. 30 at 20). Thus, when Barnhouse arrived at work on September 2, she gave Spillman her doctor's note. Spillman discussed the matter with her supervisor, Joe Schneider, the Post Office Operations Manager ("POOM"). Joe said that Barnhouse's doctor's note was not sufficient documentation that she was cleared to return to work, that Spillman should ask Barnhouse to leave, and referenced the continuing investigation into the incident from August 8. (ECF No. 30 at 20).

On September 12, 2014, Barnhouse's doctor filled out the Department of Labor CA-17 form. The CA-17 form lists various occupational activities and asks doctors to note which activities the employee/patient can perform and for how long. The doctor noted that Barnhouse could drive a vehicle for eight to twelve hours. Somewhat perplexingly, the doctor also made the following notes: "(1) pt is unable to preform [sic] the above listed duties on form CA-17" and "(2) On 9/2/14 pt may return to work and is able to preform [sic] above listed duties." (ECF No. 30 Ex. S). The doctor then checked the box only for the activity "driving a vehicle." *Id.*

Because Barnhouse's job involved more than just driving a vehicle, specifically, loading, unloading, and sorting mail, USPS also rejected this documentation. (ECF No. 30 at 21 – 22). During the time that Barnhouse was attempting to submit acceptable documentation to return to work, she was paid for the one day a week she was guaranteed to work as an RCA. (ECF No. 30 at 22).

These events with Barnhouse culminated with two pre-disciplinary interviews, ("PDI") and her ultimate removal and later reinstatement with USPS. The first PDI took place on September 8, 2014. At that PDI, USPS told Barnhouse that she needed to submit additional documentation before returning to work. (ECF No. 30 at 22). The second PDI was held on

October 7, 2014 and addressed the August 8 incident. On October 8, 2014, Spillman recommended that Barnhouse be removed as an RCA. After some delay, a Notice of Removal was issued to Barnhouse on November 18, 2014. (ECF No. 30 at 22).

Barnhouse's Notice of Removal told her she would be removed from work on December 20, 2014. (ECF No. 30 Ex. U). The Notice of Removal was based on the events of August 8, 13, and 14. The August 8, 2014 incident was when Barnhouse allegedly behaved aggressively towards Spillman. Spillman alleged in the Notice of Removal that on August 13 and August 14, witnesses said Barnhouse "flipped out in the office," that she told one employee "You better watch yourself," and that she was "on the phone cursing and screaming for approximately twenty minutes." (ECF No. 30 Ex. U at 1).

Barnhouse filed a grievance about the Removal, and she was ultimately reinstated in January 2015, with money damages, as part of a settlement between USPS and the union. (ECF No. 30 at 23). She was reinstated because too much time lapsed between the incidents and the removal. *Id.* Barnhouse also had a settlement with compensation for USPS's delay in allowing her to return to work after September 2, 2014. (Barnhouse Dep. 132: 22–137:11).

## II.    STANDARD OF REVIEW

A motion for summary judgment is governed by the requirements of Federal Rule of Civil Procedure 56. Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A fact is material only if it "might affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In evaluating a motion for summary

judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013).

The party seeking summary judgment bears the initial burden of presenting law and argument in support of its motion as well as identifying the relevant portions of " 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If the moving party satisfies this initial burden, then the nonmoving party must present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). The mere possibility of a factual dispute is insufficient to defeat a motion for summary judgment. *See Mitchell v. Toledo Hospital*, 964 F.2d 577, 582 (6th Cir. 1992).

Summary judgment is inappropriate, however, "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251-52). The mere existence of a scintilla of evidence in support of the opposing party's position is not enough to survive summary judgment; there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson*, 477 U.S. at 251; *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995). It is proper to enter summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the

burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where the nonmoving party has "failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322 (quoting *Anderson*, 477 U.S. at 250).

### III.    LAW & ANALYSIS

### A. Title VII Claims

In her Complaint, Ms. Barnhouse alleged sex discrimination based on two events: (1) being denied the Rural Carrier position, and (2) being retaliated against for making complaints about sexual harassment and filing a complaint with the Equal Employment Opportunity Commission. At Summary Judgment, however, Ms. Barnhouse conceded that "Defendant's actions taken against her likely were not based on her sex." (ECF No. 34 at 20). She proceeded to only argue the Title VII retaliation claim. Thus, Ms. Barnhouse has abandoned her claims of direct discrimination, and Defendant's Motion for Summary Judgment is **GRANTED** as to those claims.

Title VII of the 1964 Civil Rights Act prohibits discrimination on the basis of sex. Title VII also prohibits retaliation against an employee for engaging in protected activity—that is, an employer may not discriminate against an employee "because he has opposed . . . an unlawful employment practice . . . , or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing . . . ." 42 U.S.C. § 2000e-3(a).

When a plaintiff cannot show a Title VII claim directly, the *McDonnell Douglas* burden shifting test applies. *See Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 784 n.6 (6th Cir. 2016). A plaintiff claiming she was discriminated against on the basis of sex has "the initial burden under the statute of establishing a prima facie case of [sex] discrimination."

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  To establish a prima facie case, Ms. Barnhouse must show:

> (1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, *or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor*; and (4) there was a causal connection between the protected activity and the adverse employment action *or harassment*.

*Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000).

If the plaintiff can show a prima facie case, the defendant then bears the burden "to 'articulate some legitimate, nondiscriminatory reason' for its actions."  *Canitia v. Yellow Freight System, Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990) (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802).  The plaintiff then must show "that the proffered reason was not the true reason for the employment decision."  *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

Ms. Barnhouse alleges that Ms. Spillman retaliated against her for filing a complaint with the EEOC.  She alleges that Ms. Spillman claimed Ms. Barnhouse was angry and threatening when she was asking why she was not selected for the Rural Carrier position, that Spillman required her to work on days she had previously been approved to be on vacation, that Spillman "refused to return Ms. Barnhouse to work, scheduled two PDIs, and issued a Notice of Removal that was in effect until January of 2015."  (ECF No. 34 at 21).

### 1.  McDonnell Douglas Step One: The Prima Facie Case

USPS has conceded that Ms. Barnhouse can show the first two requirements for a Title VII retaliation claim: "she engaged in protected activity by contacting an EEO counselor in July 2014," and Spillman knew about Ms. Barnhouse contacting the EEOC by November 2014. (ECF No. 30 at 57).  USPS disputes, however, that Ms. Barnhouse can show that the actions taken were adverse employment actions and that the actions were caused by Ms. Barnhouse's protected conduct.

*a. Adverse Employment Action or Severe or Pervasive Retaliatory Harassment*

Retaliatory action is not limited to actions that take place in the workplace. Rather, "[a]n employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm outside the workplace." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006). An adverse employment action is a materially adverse employment action for the purposes of a prima facie retaliation case if "a reasonable employee would have found the challenged action materially adverse, 'which in this context means that it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington Northern and Santa Fe Ry. Co.*, 548 U.S. at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). This burden is less "onerous in the retaliation context than in the anti-discrimination context." *Spellman v. Ohio Dep't of Transportation*, 244 F. Supp. 3d 686, 703 (S.D. Ohio 2017) (citing *Michael v. Caterpillar Fin. Servs. Corp.,* 496 F.3d 584, 596 (6th Cir. 2007)).

Ms. Barnhouse argues that USPS's revocation of her previously scheduled vacation days, delay in allowing her to return to work after her FMLA leave, the two PDIs and investigation into her conduct, and termination of her employment were retaliatory actions. (ECF No. 34 at 21). In general, "normally petty slights, minor annoyances, and simple lack of good manners will not create [the] deterrence" required to show a materially adverse employment action. *Burlington Northern and Santa Fe Ry. Co.*, 548 U.S. at 68. But, whether alleged retaliatory actions can be considered materially adverse "will often depend upon the particular circumstances." *Id.* at 69. For example, "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children." *Id.*

A purposeful delay or cancellation of an employee's previously scheduled vacation days, investigations into an employee's conduct, and disciplinary hearings can be considered adverse employment actions. While similar actions would not be considered material adverse employment actions when determining whether an employee was discriminated against, the threshold for adverse actions in the retaliation context is much lower. *See Spellman v. Ohio Dep't of Transportation*, 244 F. Supp. 3d 686, 703 (S.D. Ohio 2017) (determining that being required to take two paid administrative leaves and undergo a psychological evaluation constituted adverse employment action for plaintiff's retaliation claims, but not discrimination claims) (citing *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007)); *Szeinbach v. Ohio State Univ.*, 493 F. App'x 690, 695 (6th Cir. 2012) (reversing district court and finding that university's investigation of professor's alleged research misconduct constituted an adverse employment action under Title VII).

In addition, Ms. Barnhouse's delayed return to work and temporary termination can be considered materially adverse employment actions. The Supreme Court has held that it was reasonable for a jury to find that 37 days without pay was a materially adverse employment action, even when the plaintiff was ultimately reinstated with backpay. *Burlington Northern and Santa Fe Ry. Co.*, 548 U.S. at 72. The evidence here is weaker than it was in *Burlington Northern*. In *Burlington Northern*, the plaintiff's entire family had to go without income, and she testified that it was "the worst Christmas I had out of my life." *Id.* at 73. Nevertheless, the Supreme Court stated that "[m]any reasonable employees would find a month without a paycheck to be a serious hardship." *Id.* at 72. Thus, it is reasonable for a jury to find that Ms. Barnhouse's removal was an adverse employment action.

*b. Causal Connection*

A claim for Title VII retaliation also requires the plaintiff to show that the protected conduct was the but-for cause of the materially adverse action; that is, "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas SW Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). All that is required to make a prima facie claim of retaliation is "some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from that evidence, providing it is credible." *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997). Temporal proximity between the protected activity and the adverse employment action is insufficient, standing alone, to show causation where some time has passed between the protected activity and the adverse action. *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 650 (6th Cir. 2015). Temporal proximity coupled with other evidence, including "frequent discipline for trivial matters and unwarranted criticism of the plaintiff's work" may be enough to show causation. *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000) (citing *Moore v. KUKA Welding Systems*, 171 F.3d 1073, 1080 (6th Cir. 1999)).

Ms. Barnhouse has not addressed the requirement of showing a causal connection in her Response. This alone is likely grounds for concluding that she has not met her burden to show the elements of the prima facie case. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 676 (6th Cir. 2013) (finding that the failure to establish causation "all but resolves this case") *abrogated on other grounds by Univ. of Texas SW Med. Ctr. v. Nassar*, 570 U.S. 338 (2013).

There is not any genuine dispute regarding the reasoning for Ms. Barnhouse's being required to work on August 13, 14 and 15. Defendants state that the reason Ms. Barnhouse was

required to work those days was because they were short-staffed and the substitute carrier that was to pick up Ms. Barnhouse's shifts was called to work in another office after a staff member there experienced a family emergency. (ECF No. 36 at 6). Plaintiff also concedes that this was the reasoning in her Response. (ECF No. 34 at 6). Therefore, Ms. Barnhouse cannot establish that the revocation or cancellation of those vacation days was on account of her EEOC complaint.

Ms. Barnhouse may be able to establish causation with regards to the PDIs/investigation into her conduct, Spillman's delaying her return to work, and her termination for one month. Assuming that Spillman knew about Barnhouse's contact with the EEOC on August 8, 2014, when the alleged confrontation took place, Barnhouse attended a PDI relating to the August 8 incident in November 2014 and was terminated in December. Thus, approximately four months elapsed between her protected activity and her notice of removal. This may already be too long to support an inference from temporal proximity because the Sixth Circuit has found "a period of more than four months . . . to be too long to support an inference of causation." *Imwalle v. Reliance Medical Prods., Inc.*, 515 F.3d 531, 550 (6th Cir. 2008) (citing *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir.1986)). But, it is likely that Spillman did not know about the protected activity until much later and thus, the temporal proximity may actually be less than four months.

Additionally, Spillman continued to refuse Ms. Barnhouse's documentation relating to Ms. Barnhouse's ability to go back to work. (ECF No. 34 at 8). Although the CA-17 form submitted by Ms. Barnhouse appeared contradictory, the other doctor's note she submitted, although brief, was clear that her doctor had signed off on her return to work. (ECF No. 34, Ex. 10). Furthermore, Ms. Spillman had accepted a similarly perfunctory doctor's note from Ms.

Revennaugh and permitted her to return to work.  (ECF No. 34 at 15).  The likelihood of

temporal proximity, coupled with Ms. Spillman's refusal to accept Ms. Barnhouse's return to

work documentation when she had accepted similar documents from others, may be enough to

establish causation—even though doing so requires several inferences from the facts as they

currently stand.

### 2.  *McDonnell Douglas Step Two: Legitimate, Non-Discriminatory Reason*

Even if Ms. Barnhouse's Response can be read as sufficiently stating a prima facie case

of Title VII retaliation, a conclusion that would be a generous reading of her Response, USPS

would then need to articulate a legitimate, non-discriminatory reason for its actions.  USPS's

burden is merely one of production, not persuasion; it involves no credibility assessment."

*Halfacre v. Home Depot, U.S.A.*, Inc., 221 F. App'x 424, 429 (6th Cir. 2007) (citing *Reeves v.*

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).  It is sufficient if a defendant

"explains what he has done" or "produces evidence of legitimate nondiscriminatory reasons."

*Bd of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 25 n.2 (1978).

USPS offers in explanation that it did not return Ms. Barnhouse to work and issued PDIs

because she did not submit adequate paperwork and because she was being investigated for her

behavior on August 8, 2014.  (ECF No. 30 at 54 – 55).  Specifically, the CA-17 form submitted

by Ms. Barnhouse's doctor appeared to contain contradictory information. The doctor noted in

one bullet point that Ms. Barnhouse is "unable to preform [sic] the above listed duties on form

CA-17" (the only listed duty that had a notation was "driving a vehicle," but also stated that "On

9/2/14 pt may return to work and is able to preform [sic] above listed duties.").

(ECF No. 30 Ex. S).

Additionally, Ms. Spillman had reached out to her supervisor, the Post Office Operations Manager, regarding the August 8 incident, and an investigation into that incident was initiated. (ECF No. 31, Ex. A at 78-79). USPS contends that based on the facts before it at the time, it honestly believed that Ms. Barnhouse's conduct warranted removal. (ECF No. 30 at 63-64). These are adequate, legitimate reasons for USPS's activity and are supported by the CA-17 form and the detailed rationale in the Notice of Removal. (ECF No. 30 Ex. S; ECF No. 34, Ex. 14); *see Romans v. Michigan Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012) (affirming decision of district court that defendant had articulated a legitimate and nondiscriminatory reason for firing plaintiff where defendant pointed to a "Summary of Investigation" document detailing plaintiff's workplace policy violations, and noting that the "key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action") (internal quotation marks omitted). Thus, USPS has carried its burden of articulating legitimate, nondiscriminatory reasons for the adverse employment actions, and Ms. Barnhouse must demonstrate that these reasons are mere pretext for discrimination.

### 3. McDonnell Douglas Three: Pretext

Once the employer has offered legitimate, non-discriminatory reasons for its actions, the burden shifts back to the plaintiff to show that those articulated reasons are not, in fact, the true reasons for the employer's actions. A plaintiff can show pretext in one of three ways:

> (1) had no basis in fact, (2) did not actually motivate the employer's action, or (3) were insufficient to motivate the employer's action. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994). A defendant's proffered reason cannot be proved to be a pretext "unless it is shown both that the reason was false, and that discrimination [or retaliation] was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

*Harris v. Metropolitan Government of Nashville and Davidson County, Tenn.*, 594 F.3d 476, 486 (6th Cir. 2010).

Additionally, [i]f the employer had an honest belief in the proffered basis for the adverse employment action, and that belief arose from reasonable reliance on the particularized facts before the employer when it made the decision, the plaintiff will fail to establish the basis for the decision was pretextual. *Braithwaite v. Timken Co.,* 258 F.3d 488, 494 (6th Cir.2001) (citation omitted); *Smith v. Chrysler,* 155 F.3d 799, 807 (6th Cir.1998) ("In deciding whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.").

*Halfacre*, 221 F. App'x at 430.

Ms. Barnhouse's claim must fail at this stage of the *McDonnell Douglas* burden shifting analysis. Ms. Barnhouse has not even attempted to show that USPS's articulated reasons were pretextual. She has addressed only the prima facie case for Title VII retaliation. (ECF No. 34 at 21). She has alleged that her documentation to return to work was not accepted as sufficient while similar documentation from Revennaugh was. *Id.* at 15. But even taking that as true, she has not rebutted the explanation that she was not returned to work because of the pending investigation into the August 8 incident and was terminated because of her conduct. *See Shrivastava v. RBS Citizens Bank, N.A.*, 227 F. Supp. 3d 824, 835 (E.D. Mich. 2017) ("When an employer offers more than one independent, legitimate, non-discriminatory reason for an adverse employment action, even if one is found to be pretextual but at least one other is not, the defendant employer is still entitled to summary judgment."); *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 – 06 (6th Cir. 1998) (quoting *Kariotis v. Navistar Int'l Trans. Corp.*, 131 F.3d 672, 676 (7th Cir. 1997)) ("In challenging an employer's action, an employee 'must demonstrate that the employer's reasons (each of them if the reasons independently caused [the] employer to take the action it did) are not true.'").

Because Ms. Barnhouse did not demonstrate that both of USPS's legitimate non-discriminatory reasons for the actions taken against her were pretext, summary judgment for USPS on Ms. Barnhouse's Title VII retaliation claim is **GRANTED**.

## B.  FMLA Claims

The FMLA entitles employees to up to twelve weeks of unpaid leave to care for their own "serious health condition" or that of a family member.  29 U.S.C. § 2612(a)(1).  This leave "may be taken intermittently or on a reduced leave schedule when medically necessary."  29 U.S.C. § 2612(b)(1).  Additionally, where an employer offers paid leave, an employee may choose, or an employer may mandate, that the employee first use their paid leave before FMLA unpaid leave is used.  In that case, the weeks taken as paid leave count towards the twelve total weeks protected under the FMLA.  29 U.S.C. §2612(d).  The FMLA requires employees to provide notice of leave, generally thirty days but if not possible, then "such notice as is practicable."  Id. at §2612(e)(2).

Once an employee takes FMLA leave, they are entitled "(A) to be restored . . . to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment."  29 U.S.C. § 2614(a)(1).  An employer may require certification from a health care professional that a serious health condition of the employee or his or her relative prevents them from working.  § 2614(c)(3).  An employer may also require certification that the employee may return to work, if the employer has a "uniformly applied practice or policy."  § 2614(a)(4).

A plaintiff may seek to show a violation of their rights under the FMLA under two legal theories: interference or retaliation.  Interference claims are based on "interfer[ence] with the

FMLA-created right to medical leave or to reinstatement following the leave" and intent is irrelevant. *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2010) (citing *Arban v. West Pub. Corp.*, 345 F.3d 390, 401 (6th Cir. 2003). Retaliation claims, however, examine the employer's motive and ask whether the employer took an adverse action because of an employee's exercise of their FMLA rights. *Id.*

When a plaintiff seeks to prove an FMLA violation "based on circumstantial evidence," the McDonnell Douglas framework applies. *Seeger v. Cincinnati Bell Telephone Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012). Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden to make out a prima facie case. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Once he does so, the burden shifts to the employer to articulate "a legitimate, nondiscriminatory reason" for its actions. *Donald v. Sybra, Inc.*, 667 F.3d at 761. The plaintiff then must show "that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1021 (6th Cir.2000).

### 1. *Interference Claims*

A prima facie case for FMLA interference consists of the following five elements:

> (1) [plaintiff] was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of his intention to take leave; and (5) the employer denied the employee FMLA benefits to which he was entitled. *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003).

*Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005).

In addition to denying an employee FMLA leave directly, an interference claim can also be based on "discouraging an employee from" taking FMLA leave and "manipulation by a covered employer to avoid responsibilities under [the] FMLA." 29 C.F.R. § 825.220(b). As one court has noted, "[i]nterference occurs when an employer 'shortchanges an employee's leave

time, denies reinstatement, or otherwise interferes with an employee's substantive FMLA rights.'" *Marshall v. The Rawlings Company LLC*, 854 F.3d 368, (6th Cir. 2017) (quoting *Seeger*, 681 F.3d at 283).  The Sixth Circuit has also stated that "[i]f an employer takes an employment action based, in whole or in part, on the fact that the employee took FMLA-protected leave, the employer has denied the employee a benefit to which he is entitled." *Wysong v. Dow Chemical Co.*, 503 F.3d 441, 447 (6th Cir. 2007).  This so-called "interference-by-retaliation claim[] . . . did not, however, alter this circuit's well-established rule that employees can only recover for an employer's retaliatory actions under the FMLA if they show an adverse employment action." *Groening v. Glen Lake Community Schools*, 884 F.3d 626, 632 (6th Cir. 2018).

There has been some debate about whether the *McDonnell Douglas* burden shifting framework applies to FMLA interference claims.  *See Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012) (noting the confusion over whether *McDonnell Douglas* applies to interference claims).  In *Donald,* that the Sixth Circuit noted it had "effectively adopted the *McDonnell Douglas* tripartite test without saying as much." *Id.*  *Donald* relied on *Grace v. USCAR*, in which the Sixth Circuit "stated that, in an FMLA interference claim, an employer may prove it had a legitimate reason unrelated to the exercise of FMLA rights for terminating the employee." *Donald*, 667 F.3d at 762 (citing *Grace v. USCAR*, 521 F.3d 655, 670 (6th Cir. 2008)).  The employee can then "seek to rebut [the proffered reason] by a preponderance of the evidence . . . 'by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'" *Grace*, 521 F.3d at 670 (quoting *Wexler v. White's Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003)).

The Sixth Circuit in *Grace* noted that this burden-shifting applied despite the fact that "[a]n employer's intent is not directly relevant to the [interference] inquiry," because there is no FMLA interference "if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct.'" *Grace*, 521 F.3d at 670 (quoting *Edgar v. JAC Prods.*, 443 F.3d 501, 508 (6th Cir. 2006)). A later, unpublished decision suggested that the *McDonnell Douglas* framework may only apply if an employer in fact "offer[s] a 'legitimate reason unrelated to the exercise of FMLA rights.'" *Jaszczyszyn v. Advantage Health Physician Network*, 504 F. App'x 440, 448 (6th Cir. 2012) (quoting *Donald*, 667 F.3d at 762).

### a.   Vicki Revennaugh

Revennaugh focuses the entirety of her Response on the Saturdays that she requested off in October and November. This Court will accordingly only address Revennaugh's claims for FMLA interference for Saturdays in October and November. *See Hicks v. Concorde Career College*, 449 F. App'x 484, 487 (6th Cir. 2011) (finding that "district court properly declined to consider the merits of [a] claim because [plaintiff] failed to address it in either his response to the summary judgment motion or his response to [defendant's] reply brief."). USPS conceded the first three elements of the prima facie case for FMLA interference for the October and November dates. (ECF No. 31 at 25). Thus, the only issues are whether Ms. Revennaugh gave USPS appropriate notice of her request and whether USPS denied her FMLA benefits to which she was entitled.

Under the FMLA, an employer can "delay or deny" FMLA leave if an employee does not have "unusual circumstances" to justify noncompliance with the employer's procedures for requesting such leave, 29 U.S.C. § 825.302(d). *See also Srouder v. Dana Light Axle Mfg., LLC*, 725 F.3d 608, 614–15 (6th Cir. 2013). USPS thus addressed the wrong legal standard because it

relied on prior Sixth Circuit precedent that held that "employers cannot deny FMLA leave on grounds that an employee failed to comply with internal procedures – as long as 'the employee gives timely verbal or other notice.'" *Cavin v. Honda of America Mfg., Inc.*, 346 F.3d 713, 722 (6th Cir. 2003) (quoting 29 C.F.R. § 825.302(d)); *abrogated by statute as recognized in Srouder*, 725 F.3d at 614–15. Some courts have found, however, that even where an employer has stated a uniform policy, if the employer in reality follows a different policy, the policy that is actually followed can be the one that forms the standard by which to judge an employee's notice. *See, e.g.*, *Archey v. AT&T Mobility Servs. LLC*, No. 17-91-DLB-CJS, 2019 WL 1434654, at *7 (E.D. Ky. Mar. 29, 2019) (finding a genuine dispute of material fact where FMLA policy on company intranet conflicted with second policy outlined in a separate FMLA handbook given to employees).

USPS argues that Revennaugh did not provide any notice, let alone adequate notice, per USPS policy, of her need to take FMLA leave. Revennaugh argues that she turned in a doctor's note on August 12. (ECF No. 33 at 5, 13–14). The doctor's note she submitted on August 12 said that she needed to have Saturdays off to care for her parents and included her FMLA case number for each parent. (ECF No. 33 Ex. 6). Revennaugh concedes that she did not submit leave slips, either informally, or formally through PS Form 3971 for those Saturdays off. Revennaugh Dep., Ex. A, at 129:10–12. Revennaugh justifies why she did not submit any requests because Spillman "had been denying my FMLA, . . . so it would not have done any good." Revennaugh Dep. 129:16–18. Revennaugh argues, however, that her doctor's note from August was sufficient notice. USPS argues that merely submitting a doctor's note is not sufficient notice that Revennaugh intended to take those particular Saturdays off for FMLA

leave.  USPS argues that Spillman did not know "that Revennaugh purportedly used her Saturdays off to provide care for her parents."  (ECF No. 31 at 25).

As the Sixth Circuit has made clear, "[t]o invoke the protection of the FMLA, an employee must provide notice, and a qualifying reason for requesting the leave." *Wallace v. FedEx Corp.*, 764 F.3d 571, 586 (6th Cir. 2014).  Importantly, "[t]he employee need not expressly assert rights under the FMLA or even mention the FMLA." *Id.*  Rather, [a]n employee gives his employer sufficient notice that he is requesting leave for an FMLA-qualifying condition when he gives the employer enough information for the employer to reasonably conclude that an event described in the FMLA . . . has occurred." *Id.*  The employee's burden is not a heavy one. *Id.*

A doctor's note can provide sufficient notice of an employee's need for a scheduling change for FMLA purposes. *See Verhoff v. Time Warner Cable, Inc.*, 299 F. App'x 488 (6th Cir. 2008) (finding adequate a doctor's note stating that an employee "could not work more than forty-hours per week").  Other cases, however, have found that an employee did not provide sufficient notice where he merely told his employer that he had a doctor's appointment scheduled on a particular day but did not request time off. *See Walton v. Ford Motor Co.*, 424 F.3d 481, 486 (6th Cir. 2005).

USPS argues that, because Revennaugh never requested leave, she cannot meet the fifth requirement—that "the employer denied [her] FMLA benefits to which [she] was entitled," *Walton*, 424 F.3d at 485 (citing *Cavin*, 346 F.3d at 719)—arguing she was not *entitled* to any FMLA leave because she did not ask for those specific days off.  Because there is a genuine dispute of material fact as to whether notice was adequate, however, this argument must fail. Revennaugh in her deposition stated that she "was working Saturday shifts."  (ECF No. 33 Ex. 1,

Revennaugh Dep. 129:25). If Revennaugh gave adequate notice but was nevertheless scheduled to work on the days she should have been off for FMLA leave, she has stated a prima facie case of FMLA retaliation.

USPS has proffered a legitimate, non-discriminatory reason for sending Revennaugh the August 21, 2014 letter requesting additional documentation but has not addressed the denial of Revennaugh's leave in October and November other than to say that the notice was inadequate. Because "intent is irrelevant" in the FMLA interference context, "if Plaintiff can show that she was denied FMLA benefits to which she was entitled, the employer is strictly liable." *Kitts v. Gen. Tel. North, Inc.*, No. 2:04-cv-173, 2005 U.S. Dist. LEXIS 20421, at *26 (S.D. Ohio Sept. 19, 2005) (citing *Hoge v. Honda of Am. Mfg.*, 384 F.3d 238, 244 (6th Cir. 2004).

USPS argues that even if Revennaugh can make out a prima facie interference claim, she cannot show any damages from such claim. An employee cannot prevail:

> unless the employee has been prejudiced by the violation: The employer is liable only for compensation and benefits lost "by reason of the violation," § 2617(a)(1)(A)(i)(I), for other monetary losses sustained "as a direct result of the violation," § 2617(a)(1)(A)(i)(II), and for "appropriate" equitable relief, including employment, reinstatement, and promotion, § 2617(a)(1)(B). The remedy is tailored to the harm suffered.

*Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002).

USPS argues that Revennaugh has been unable to quantify what her damages were, and that she used paid leave for her absence. Revennaugh's Response alleges "lost wages" and "medical and other expenses." (ECF No. 33 at 9). She submitted a Declaration in support of those allegations, but the Declaration relates to damages only for the FMLA leave in August and September. (ECF No. 34 Ex. 13). As this Court found above, however, Revennaugh did not address those claims for interference in her response and thus conceded the August and September FMLA violation claims.

Revenaugh has not brought forward evidence of what, if any, recoverable damages she incurred for the October and November Saturdays. Employees are not limited to claiming damages under the FMLA. Under the plain text of the statute, equitable relief may also be appropriate. Still, Revennaugh must counter USPS's assertion with some evidence of harm resulting from the Saturdays she spent working in October and November. *See Edgar v. JAC*, 443 F.3d 501, 508 (6th Cir. 2006) ("Employees seeking relief under the entitlement theory must therefore establish that the employer's violation caused them harm.").

If "there are no damages, the statute provides no remedy." *Theiss v. Walgreens, Co.*, 632 F. App'x 829, 833 (6th Cir. 2015) (citing *Ragsdale*, 535 U.S. at 89) (determining that employer was entitled to summary judgment where employee failed to show that she suffered any actual harm and alleged "no actual damages"). Because Ms. Revenaugh has failed to bring forward any evidence of damages relating to the Saturdays she was required to work in October and November, USPS's Motion for Summary Judgment as to Revennaugh's interference claim is hereby **GRANTED.**

### b. Stephanie Barnhouse

Ms. Barnhouse argues that her FMLA rights were violated because USPS refused to return her to work after she took FMLA leave, despite her having provided medical documentation stating that she could return to work without restriction. (ECF No. 34 at 14). USPS concedes the first four elements of Barnhouse's prima facie case but argues that Barnhouse cannot show that she was denied FMLA benefits to which she was entitled because Barnhouse was put on the FMLA leave she requested. (ECF No. 30 at 66-67). Barnhouse concedes as much. (ECF No. 34 at 14). USPS therefore argues that the only way Barnhouse

could show an FMLA violation is essentially to show interference by retaliation—that is, to show that the employer denied her FMLA benefits by taking an adverse employment action. *See Wysong v. Dow Chem. Co.,* 503 F.3d 441, 446 (6th Cir. 2007). The standard for what constitutes an adverse employment actions is higher for interference claims than the standard for adverse employment actions in the retaliation context. *See Groening v. Glen Lake Cmty. Sch.*, 884 F.3d 626, 632 (6th Cir. 2018) (addressing interference by retaliation claim and noting that plaintiff is still required to establish that employer took adverse employment action against her and that "*Wysong* did not create a category of "retaliation-lite" claims"). Because of the higher standard for finding that an adverse employment action occurred in the interference context, actions that would be considered materially adverse in the retaliation context may not be considered so for an interference claim. See *Spellman v. Ohio Dep't of Transportation*, 244 F. Supp. 3d 686, 703 (S.D. Ohio 2017) (citing *Michael v. Caterpillar Fin. Servs. Corp.,* 496 F.3d 584, 596 (6th Cir. 2007)).

Due to this heightened standard, Ms. Barnhouse is unable to establish that USPS's refusal to reinstate her was an adverse employment action. Ms. Barnhouse's return to work was delayed due, at least in part, to an investigation into her behavior on August 8. (ECF No 30 at 81). Moreover, while her return to work was delayed, she was paid for the one day of work a week that she was guaranteed to work. (ECF No. 30 at 80; ECF No. 34 Ex. 1, Barnhouse Dep. 179:25–181:10). An employee's placement on paid administrative leave pending an investigation is not considered an adverse employment action in the context of interference claims. *See Spellman v. Ohio Dep't of Transportation*, 244 F. Supp. 3d 686, 702 (S.D. Ohio 2017) (collecting cases holding that temporary removal or forced administrative leave with pay are not, in and of themselves, materially adverse employment actions); *Dendinger v. Ohio,* 207

Fed.Appx. 521, 527 (6th Cir.2006) (holding that employer's investigation into suspected wrongdoing by employee and placement of that employee on paid leave did not constitute an adverse employment action for a discrimination claim); *Peltier v. United States,* 388 F.3d 984, 988 (6th Cir. 2004) (holding that an employee's placement on paid administrative leave pending the outcome of an investigation is not an adverse employment action).

Because Ms. Barnhouse has not shown that she suffered an adverse employment action, USPS's Motion for Summary Judgment as to Ms. Barnhouse's interference claim is **GRANTED**.

### 2. *Retaliation Claims*

Claims for FMLA retaliation invoke the McDonnell Douglas framework. Again, under the McDonnell Douglas framework, the plaintiff bears the initial burden to make out a prima facie case. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Once he does so, the burden shifts to the employer to articulate "a legitimate, nondiscriminatory reason" for its actions. *Donald v. Sybra, Inc.*, 667 F.3d at 761. The plaintiff then must show "that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1021 (6th Cir.2000).

> A prima facie case for FMLA retaliation states the following
> (1) [the employee] was engaged in a statutorily protected activity; (2) [the employer] knew that he was exercising his FMLA rights; (3) he suffered an adverse employment action; and (4) a causal connection existed between the protected FMLA activity and the adverse employment action.

*Seeger*, 681 F.3d at 283.

### a. Vicki Revennaugh

Revennaugh alleges that USPS retaliated against her for taking FMLA leave because it required her to attend a PDI while she was out on leave, to explain her previously unexcused

absences.  (ECF No. 33 at 16).  USPS concedes elements one and two of Revennaugh's prima facie case, but argues that she suffered no adverse employment action, nor was any such adverse employment action causally connected to her FMLA leave.  (ECF No. 31 at 32).  USPS argues that the PDI did not ultimately result in any discipline.  *Id.*  Revennaugh does not dispute this. *Id.*  She does note, however, that she was required to attend the PDI without pay while she was on leave.  (ECF No. 33 at 16).

USPS is incorrect on the law by suggesting that a PDI, without more, cannot constitute an adverse employment decision.  The Sixth Circuit has suggested that investigations into an employee's alleged wrongdoing can constitute adverse employment actions.  *See Szeinbach v. Ohio State Univ.*, 493 F. App'x 690, 695 (6th Cir. 2012).  Moreover, the bar is much lower when establishing an adverse employment action for retaliation claims than it is for discrimination claims.  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67, 126 S. Ct. 2405, 2415, 165 L. Ed. 2d 345 (2006); *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 616–17 (6th Cir. 2019); *Crawford v. JP Morgan Chase & Co.*, 531 F. App'x 622, 627 (6th Cir. 2013) (adopting *Burlington* standard for retaliation claims under FMLA).

USPS argues that Revennaugh cannot show causation based on temporal proximity between the time when she took her FMLA leave and the PDI hearing because the relevant timeframe for a causal connection is when the employer first learned of the protected activity. (ECF No. 31 at 33).  Temporal proximity alone is sufficient to establish a prima facie case of FMLA retaliation.  *See Bush v. Compass Grp. USA, Inc.*, 683 F. App'x 440, 451 (6th Cir. 2017). USPS alleges that Revennaugh first requested FMLA leave to care for her parents in March 2013, over a year before the September PDI.  (ECF No. 31 at 34).  While USPS does state the correct standard for establishing a causal connection based on temporal proximity, it misapplies

it to the facts of this case. While it is true that Ms. Barnhouse had previously requested FMLA leave to care for her parents, the FMLA leave she took in August was related to her own illness. USPS thus learned that she was engaging in this protected activity for the first time in August. Ms. Revennaugh has established causation based on temporal proximity.

Because Ms. Revennaugh has established a prima facie case of retaliation, USPS must provide a legitimate business reason for its action. USPS offers that Spillman sent Revennaugh an absence inquiry letter to inquire into the circumstances surrounding Revennaugh's unplanned absence on August 15. (ECF No. 31 at 36). USPS does not provide a reason for why Spillman scheduled a PDI after Revennaugh's FMLA had already been approved. While it is true that USPS is entitled to ask that an employee provide "notice and a qualifying reason for requesting . . . leave," *Walton v. Ford Motor Co.*, 424 F.3d 481, 486 (6th Cir. 2005), USPS did receive this notice and a doctor's note from Revennaugh relating to her reason for requesting this leave. (ECF No. 33 Ex. 8, Ex 9). Furthermore, Revennaugh's FMLA leave was approved by USPS on August 29, 2014. *Id.* The letter scheduling the September 10, 2014 PDI was sent to Revennaugh by Spillman and dated September 8, 2014. (ECF No. 33 Ex. 11). At the PDI, Revennaugh stated that the Zanesville Postmaster who was present at the meeting, Ed Thorne, indicated that the proceeding was "unnecessary." (ECF No. 33 Ex. 1, Revennaugh Dep. 62:22-63:5). Given these facts, Revennaugh has established there is a genuine issue of material fact as to whether Spillman's issuance of the PDI was in retaliation for Barnhouse's having taken FMLA leave.

Defendant's motion for summary judgement on Ms. Revennaugh's claim for retaliation in violation of the FMLA is **DENIED**.

b. *Stephanie Barnhouse*

Barnhouse also alleges that USPS retaliated against her for asserting her FMLA rights. USPS has chosen to concede the first two requirements of Barnhouse's prima facie case for FMLA retaliation: that she was engaged in protected activity and that the employer knew of the protected activity. (ECF No. 30 at 79). USPS disputes, however, that she suffered any adverse employment action or that there was a causal connection between her FMLA leave and the alleged adverse employment action. *Id.* Again, the McDonnell-Douglas framework applies.

Similar to what Ms. Barnhouse alleges for her Title VII retaliation claim, discussed above,[1] she alleges that the following were adverse employment actions: the two PDIs, the delay in allowing her to return to work after her FMLA leave, and her termination in November. (ECF No. 34 at 17-18). Here, however, she argues that all of these disciplinary measures were taken against her not because of her EEOC complaint, but because of her FMLA leave.

An adverse employment action is a materially adverse employment action for the purposes of a prima facie retaliation case if "a reasonable employee would have found the challenged action materially adverse, 'which in this context means that it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington Northern and Santa Fe Ry. Co.*, 548 U.S. at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). This burden is less "onerous in the retaliation context than in the anti-discrimination context." *Spellman v. Ohio Dep't of Transportation*, 244 F. Supp. 3d 686, 703 (S.D. Ohio 2017) (citing *Michael v. Caterpillar Fin. Servs. Corp.,* 496 F.3d 584, 596 (6th Cir. 2007)).

The Sixth Circuit has indicated that "the standard for showing an adverse employment action is the same in the FMLA retaliation and Title VII retaliation

---

[1] *See* Section III.A. Title VII Claims.

contexts." *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 616–17 (6th Cir. 2019);

*Crawford v. JP Morgan Chase & Co.*, 531 F. App'x 622, 627 (6th Cir. 2013) (adopting

*Burlington* standard for retaliation claims under FMLA).  Thus, as discussed in the section above

addressing Ms. Barnhouse's Title VII retaliation claims, the PDIs, delayed return to work, and

termination are adverse employment actions.

USPS also argues that Barnhouse cannot show causation.  Temporal proximity, along

with other factors, may give rise to an inference of causation.  See *Nguyen v. City of Cleveland*,

229 F.3d 559, 566 (6th Cir. 2000) (citing *Moore v. KUKA Welding Systems*, 171 F.3d 1073, 1080

(6th Cir. 1999)).  Here, Barnhouse took FMLA leave in August, was called in for her first PDI in

September immediately after the end of her leave, and her doctors notes clearing her to return to

work were both refused.  USPS offers in explanation that it did not return Ms. Barnhouse to

work and issued PDIs because she did not submit adequate paperwork and because she was

being investigated for her behavior on August 8, 2014.  (ECF No. 30 at 54 – 55).  Specifically,

the CA-17 form submitted by Ms. Barnhouse's doctor appeared to contain contradictory

information. (ECF No. 30 Ex. S).  Ms. Barnhouse, however, had earlier submitted a short

doctor's note indicating she was cleared to return to work and Ms. Spillman had accepted a

similarly sparse doctor's note from Ms. Revennaugh.  (ECF No. 34 at 15).  Given the timing of

each of the adverse employment actions, a jury could find that Ms. Barnhouse has proven

causation.

Assuming that Barnhouse can meet the prima facie case, USPS argues that it terminated

Barnhouse because of her unprofessional conduct in August.  (ECF No. 30 at 94).  Ms.

Barnhouse argues, in response, that if she had acted improperly on August 8, that USPS security

would have been called to diffuse the situation and she would have been placed on an emergency

leave. (ECF No. 34 at 18). Ms. Spillman testified that she never placed Ms. Barnhouse on "Emergency Placement" and USPS security was never called in. (ECF No 34, Ex. 2, Spillman Dep. 109-111). Ultimately, Ms. Spillman took no action other than beginning an investigation for months. In fact, this delay was the reason Barnhouse was ultimately reinstated. (ECF No 30 at 23). Ms. Spillman's failure to take action cuts against the USPS's stated reason for delaying Ms. Barnhouse's return to work.

Still, the lapse in time does not necessarily suggest that USPS's stated reasons are pretextual. Barnhouse's additional argument cuts both ways for her claims. She attempts to rely mostly on temporal proximity to show a causal connection between her FMLA leave and the termination notice. But in the next breath argues that the actions in August, just days before she took FMLA leave, were too far removed in time to form the basis for the October PDI that led to the Notice of Termination. Given that there is a genuine issue of material fact regarding what happened on August 8, 2014 and whose version of events can be credited, summary judgement on Ms. Barnhouse's claim for retaliation for taking FMLA leave is **DENIED**.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motions for Summary Judgment is: **GRANTED** as to Ms. Barnhouse's Title VII discrimination and interference claims, **GRANTED** as to Ms. Revennaugh's and Ms. Barnhouse's FMLA interference claims, and **DENIED** as to Ms. Barnhouse's and Ms. Revenaugh's FMLA retaliation claims.


**IT IS SO ORDERED.**

                     ___s/ Algenon L. Marbley_____
                     **ALGENON L. MARBLEY**
                     **UNITED STATES DISTRICT JUDGE**


**DATED: September 25, 2019**